**S.C. JOHNSON & SON, INC., Plaintiff,**

**v.**

**DOWBRANDS, INC., DowBrands, L.P., and The Dow Chemical Company, Defendants.**

**No. CIV.A.00–444–JJF.**

United States District Court,
D. Delaware.

Feb. 14, 2003.

Allen M. Terrell, Jr., and Thad Brace-girdle, Esquires, of Richards, Layton & Finger, Wilmington, DE, Of Counsel: Maurice J. McSweeney, Andrew J. Wronski and Jessica E. Price, Esquires of Foley & Lardner, Milwaukee, WI, and James D. Dasso, Esquire, of Foley & Lardner, Chicago, IL, for Plaintiff.

Kenneth J. Nachbar, Esquire, of Morris, Nichols, Arsht & Tunnell, Wilmington, DE, Of Counsel: Herbert L. Zarov, Daniel J. Delaney, Brian J. Massengill, and David A. Jensen, Esquires of Mayer, Brown & Platt, Chicago, IL, for Defendant.

### *MEMORANDUM OPINION*

FARNAN, District Judge.

### INTRODUCTION

This is an action for breach of contract and fraudulent misrepresentation initiated by S.C. Johnson & Son, Inc. ("SCJ") against DowBrands, Inc. and DowBrands, L.P. (referred to collectively as "Dow-Brands"), arising out of an Asset Purchase Agreement dated October 27, 1997 (the "Agreement") by and between SCJ and DowBrands. Under the Agreement, SCJ purchased certain assets and assumed certain liabilities relating to DowBrands' worldwide home food management products and home care products businesses (the "Business"). The transaction closed on January 23, 1998.

SCJ filed a six count Complaint against DowBrands on May 22, 2000. With respect to Count II of its Complaint, SCJ contends that DowBrands represented that there

was an existing and profitable Latin American Business and that the evidence demonstrates that: (1) these representations were false; (2) DowBrands knew that its representations were false or at the very least made them with reckless indifference as to their truth or falsity; (3) these representations were material to the Agreement; (4) SCJ justifiably relied on these representations; and (5) SCJ is entitled to the benefit of its bargain.

DowBrands contends that it did not make any misrepresentations about the levels of diversion in Latin America and that its representations concerning its Latin American business were not material to the parties' transaction. Further, DowBrands' contends that SCJ did not reasonably rely upon any misrepresentations about the amount of diversion in DowBrands' Latin American business and that SCJ did not suffer any damages.

The Court has jurisdiction in this matter pursuant to 28 U.S.C. §§ 1332, 2201 and 2202, since the amount in controversy exceeds $75,000, exclusive of interest and costs, and the parties are citizens of different states. Additionally, venue is proper in this Court pursuant to 28 U.S.C. § 1391. Neither jurisdiction nor venue are contested by the parties.

The Court conducted a five day bench trial in this action. This Memorandum Opinion constitutes the Court's findings of fact and conclusions of law.

## BACKGROUND

### I. Nature and Stage of the Proceedings

As stated previously, SCJ filed a Complaint against DowBrands on May 22, 2000. The six counts of the Complaint are:

I. Breach of Contract Regarding Latin American Sales;

II. Fraudulent Misrepresentations Concerning Latin American Sales;

III. Breach of Contract Regarding Third Party Claims;

IV. Declaratory Judgment Relating to Intellectual Property;

V. Breach of Contract Concerning Absence of Contingent Liabilities and Material Adverse Change; and

VI. Breach of Closing Certificate.

(D.I. 1). On August 17, 2001 the Court granted DowBrands' Motion for Summary Judgment with respect to Counts I, IV, V, and VI. (D.I. 100). Also, in the same Order, the Court granted Plaintiff's Motion for Summary Judgment with respect to Count III [1] and denied DowBrands' Motion to Dismiss and Motion for Summary Judgment with respect to Count II. (D.I. 100). Therefore, as of August 17, 2001, the only count in dispute in the instant action was Count II—Fraudulent Misrepresentations Concerning Latin American Sales. Therefore, the bench trial in this matter only concerned the issue of fraudulent misrepresentations concerning Latin American Sales.

### II. Facts

#### A. History of Diversion at DowBrands Prior to Closing

DowBrands' history of sales in Latin America and its experience with diversion in general is important to the factual background of the case at bar, therefore, the Court will review DowBrands' experience

---

**1.** On August 17, 2001 the Court granted Plaintiff's Summary Judgment Motion in regard to Count III of its Complaint. (D.I. 100). Thus, the Court determined that there was a Breach of Contract Regarding Third Party claims and determined that, as a matter of law, Plaintiff was entitled to fees and expenses in defending the Tenneco litigation. Currently pending in this case is a Revised Petition for Attorney Fees and Expenses (D.I. 181). The Court will address this motion in a separate Memorandum Opinion.

with diversion. First, the Court will define international diversion because it is the central issue in this litigation. International diversion or diversion means that a product is sold in a market other than the market in which it was intended to be sold. For example, in the instant case, SCJ alleges that DowBrands' products that were supposed to be sold in Latin America were sold in the United States.

Diversion has a negative effect both on the market in which it is actually sold and the market from which it is diverted. It has a negative effect on the market from which it is diverted from because the product is not in the country, and therefore, consumers are not developing an awareness of the product and the retailers are not handling the product. As a result, there is no actual business in that market. Diversion also has a negative effect on the market in which it is actually sold. For example, consumer manufacturers try to maintain a certain pricing structure; however, the diverted product comes into the retail channel at a price lower than what a company would have normally sold it for. This lower price destroys the credibility of a sales force with other customers, and in turn, impacts the morale of the sales force. (Tr. at 109:15–111:22). Although diversion may have some short-term benefits it is a negative practice for the long-term health of a business. (Tr. at 113:18–21).

With this background in mind, the Court will recount DowBrands history of dealing with the problem of diversion. Diversion was a documented issue at DowBrands beginning in 1992. In May and June 1992, DowBrands adopted guidelines to prevent international diversion, which among other things, prohibited free on board ("FOB") shipments. For example, FOB Miami means that the freight is paid in Miami and the ownership changes in Miami; therefore the product is delivered to the Miami location. (Tr. at 338:4–6). The al-

ternative to FOB shipment is a cost, insurance and freight ("CIF") destination shipment. With a CIF destination shipment, ownership is retained and freight is paid upon arrival at the port of destination, which in the instant case would be Latin America. Thus, under an FOB Miami shipment, the product is shipped to Miami, whereas under a CIF destination shipment it is shipped to Latin America, its port of final destination. (PX 246; PX 251; Tr. at 338:8–15; 340:4–14; 1092:4–1093:3; 1480:9–13).

On June 4, 1992, Thomas Cain, a DowBrands Logistics employee, sent a letter to Michael McLain, who had responsibility for Latin America at the time, concerning International Diversion Guidelines. In his letter Mr. Cain stated "[e]very day I am struck by the number of exceptions and inconsistencies regarding price, terms, freight, etc." Among the exceptions Mr. Cain listed Latin America and stated that, "Latin America is heavy on drop shipments to U.S. consolidators (mostly Miami)." (PX 247).

In January of 1995, the shipping policy for Latin America was changed from FOB Miami to CIF destination. (Tr. at 337:18–338:2). After this change in shipping policy Latin American sales declined 68% overall, 79% excluding Puerto Rico which had a consistent business, and almost 94% excluding Venezuela. (Tr. at 347:13–349:7). After approximately four months, the shipping policy for Latin America was changed back to FOB Miami. (Tr. at 341:16–22; 349:9–18). After this change, the sales in Latin America increased and DowBrands reported a 25% increase in sales for 1995. (PX 228 at SC23496, SC23503; Tr. at 341:16–22; 349:9–350:6; 1122:5–1123:1; 1480:14–1481:17).

In mid–1996 Linda Esposito, Vice President for Canada and Latin America, asked Edward Francis to determine the extent of

the Latin American business and to develop a business plan to expand that business. Mr. Francis spent approximately 50% of his time for a year investigating the Latin American business. (Tr. at 479:1–480:9; 481:3–9; 485:14–17; Esposito Dep. 64:21–65:1; 65:22–66:12). After conducting some independent market research, Mr. Francis met with Jose Berdasco, the Sales Manager for Latin America, in Miami on August 12, 1996 in order to obtain information on the Latin American business. During the course of this meeting Mr. Berdasco did not provide Mr. Francis with the breakdown of sales by country for Latin America or names of retailers, rather he just discussed the general business climate in Latin America and his concerns about management. (Tr. at 493:21–495:9). On November 12, 1996, Ms. Esposito, Mr. Francis and Mr. Berdasco met with Jesus Cutie, the principal of Consumer Products, Inc. ("CPI") which was one of DowBrands' master distributors for South America, in order to gather information on the Latin American business. Mr. Cutie distributed several handouts in this meeting, one of which stated that in 1995 "[a]s a result of a change in delivery policies, no sales were accomplished in the first semester making it impossible to accomplish sales goals." (PX 1 at SC000062; Tr. at 500:22–501:4; 502:16–503:5; 503:7–504:13; 505:6–508:13; 511:2–512:4; 622:12–623:5). Additionally, during this meeting, Mr. Cutie did not provide a list of retailers in Latin America that sold DowBrands' products. (Tr. at 503:7–504:13).[2]

Subsequently, DowBrands retained a company named Euromonitor to examine the extent of the Latin American business. Part of Euromonitor's assignment was to conduct store checks at a representative sampling of retail outlets in Argentina, Brazil and Chile. (PX 13; PX13; PX 103 at SC10061; Tr. at 525:11–527:3; 527:14–24; 528:1–529:9; 543:16–544:11). On January 22, 1997, DowBrands received notice from Euromonitor that they had "confirmed that no Dow products were identified in any of the stores in Brazil, Chile or Argentina." (PX 17; Tr. at 529:10–531:1; 1441:6–1442:3; Esposito Dep. 130:22–131:21; 131:24–133:1; 133:10–135:11; 137:5–8).

In April 1997 Ms. Esposito authorized a Coupon Seeding Program to detect diversion that ran from May 1997 through November 1997, in which DowBrands inserted color coded "stocker appreciation" coupons inside selected cases of products shipped to its distributors for Asia (green coupons), Europe (yellow coupons) and Latin America (blue coupons).[3] Each coupon was inserted in a sealed case in the middle of a selected pallet prior to shipment to a foreign distributor, and DowBrands tracked the coupon placements and redemption by coupon number, color, distributor, shipment date and country of destination. The coupons, written in the English language, advised the finders that DowBrands would send them $50 checks if the finder either mailed the coupon to DowBrands with information about the store and case where the coupon was found or called a toll-free number with the same information. Each coupon stated that it was "valid only in the Continental USA." The program was designed to maximize the chance that a coupon found by a U.S. retail store stocker in a case sold to one of DowBrands'

---

2. Mr. Cutie later responded to Ms. Esposito's requests for lists of retailers in Latin America on December 9, 1995 but Ms. Esposito thought the response was superficial and did not satisfy her requests. (Esposito Dep. at 113:9–114:6; 114:15–20).

3. Although Ms. Esposito authorized the Coupon Seeding Program, Mr. Frey was in charge of setting up and overseeing the program. (Tr. at 336:10–14).

foreign distributors would be redeemed and DowBrands could thereby obtain evidence that a product shipped to a particular distributor had been diverted. (PX 8; Tr. at 372:3–373:8; Esposito Dep. 213:14–214:24; D.I. 146 at 22 ¶ 48). DowBrands prepared one hundred and seventy-four coupons for insertion into Latin American shipments.

On January 9, 1998 Mr. Frey, the Vice President of Logistics and Packaging, Mr. Sycks, the Vice President of International and Ms. Esposito were informed that twenty-two Latin American coupons had been redeemed in the U.S. (Tr. at 391:4–392:19). Based on these results, Mr. Frey concluded that diversion existed in the Latin American market and communicated his conclusion to Mr. Floyd, the Vice President of Logistics and Packaging, and Ms. Esposito. (Tr. at 392:20–393:11). Mr. Frey was instructed by Mr. Floyd not to disclose the results of the Coupon Seeding Program to SCJ unless specifically asked about it. (Tr. at 390:10–21). On January 12, 1998 Mr. Frey met with Mr. O'Brien and Mr. Caron from SCJ but did not mention the results or the existence of the Coupon Seeding Program. (PX 146, PX 223, PX 311; Tr. at 375:4–14; 391:4–392:19; 1155–1158:16).

On this record, the Court specifically finds that, prior to closing, DowBrands was aware that diversion was occurring in DowBrands' Latin American market. For example, at a meeting on June 16, 1997, the management of DowBrands terminated Quality Lines, one of their two distributors in Latin America, for diversion, effective July 11, 1997. (DX 84; PX 272; PX 273; Tr. at 963:6–17; 964:15–965:15). Also, effective the date of the closing, DowBrands terminated CPI, its master distributor for Latin America, because according to the terms of the transaction with SCJ, SCJ did not assume the distributorship arrangement with CPI. In its ter-

mination letter to CPI, DowBrands advised CPI that DowBrands was aware that CPI was diverting DowBrands' products in contravention of their arrangement. (PX 146; PX 167; Tr. at 392:20–393:11; 1175:12–15; 1252:20–1253:1; Norton Dep. 6:18–7:25; 15:5–16:7 79:23–81:16).

On or about November 11, 1998, DowBrands filed a lawsuit in the United States District Court for the Southern District of Florida—Dade Division against Jesus A. Cutie d/b/a/ Consumer Products, Inc. Paragraph Nine of DowBrands' Complaint against Mr. Cutie asserted:

> In direct contravention of the parties' agreement, however Cutie through CPI and in cooperation with his direct customers regularly and systematically caused the diversion of DowBrands products, ostensibly purchased for sale in CPI's distribution areas in Latin America, to the United States. The net result of this practice was that Cutie failed to properly service CPI's distributorship areas in Latin America and *undermined the sales efforts of DowBrands' distributors in the United States.* Upon information and belief this practice commenced at inception of the subject distribution agreement until its termination in January, 1998.

PX 295 at ¶ 9 (emphasis added). DowBrands obtained a Final Judgment in the Cutie lawsuit on or about January 18, 2001. The Final Judgment included a declaration that CPI diverted from Central and South America to the United States (PX 297; Tr. at 1292:1–11).

## B. Preliminary Contact Between SCJ and DowBrands

In 1997 SCJ conducted business in fifty-five countries. (Tr. at 80:2–6). In early 1997, SCJ became aware of industry rumors that DowBrands was going to offer a portion of its business for sale. (Tr. at

80:10–16). As a result, SCJ commenced some preliminary qualitative research, including retail store surveys on Dow-Brands' business, based on information publicly available at the time, which reported that no DowBrands' products were found in the Latin American stores surveyed. (Tr. at 81:5–22; 641:1–20; Tr. at 81:14–15; 20–24; McIntyre Dep. 32:20–33:2; Cieza Dep. 91:5–16).

On July 8, 1997, Goldman Sachs & Co. ("Goldman Sachs"), contacted SCJ and indicated that a portion of DowBrands' business was for sale and inquired if SCJ was interested in purchasing the business. (Tr. at 82:15–19). Goldman Sachs also informed SCJ that the sale was going to be a traditional two-step auction, where preliminary bids would be solicited, and based on the preliminary bids, a number of additional companies would be selected for final bids. For the final bids, more data would be made available, and following the data being made available, the bankers, on behalf of DowBrands, would solicit final bids and select a purchaser. (Tr. at 82:24–83:8).[4]

## C. The Offering Memorandum

SCJ indicated that it was interested in the potential acquisition of DowBrands' business. Subsequently, Goldman Sachs, on behalf of DowBrands, delivered a copy of an Offering Memorandum to SCJ for the sale of DowBrands' business of developing, manufacturing and selling a variety of home care products such as specialty cleaners, laundry products, and home food management products. (Tr. at 82:15–20; D.I. 1 at ¶ 8). The Offering Memorandum requested a preliminary bid by August 6, 1997. (Tr. at 82:13–83:8; 639:9–640:3; PX 312).

The Offering Memorandum stated that DowBrands had entered into agreements in Europe and Japan that would preclude any purchaser from directly selling any DowBrands' products in those markets. (PX 23 at 24–25; Tr. at 87:16–88:16; 88:24–90:3; 125:18–127:8). However, the Offering Memorandum indicated that DowBrands had made approximately $19 million in Latin American sales in 1996. (PX 23 at 8, 26, 75; Tr. at 90:4–91:10; 647:2–648:3). Specifically, the Offering Memorandum indicated that of this approximately $19 million in Latin American sales, $12 million of the sales were generated by Home Food Management sales ("HFM"), of which $8 million were Ziploc products. (PX 23 at 26; Tr. at 90:11–19). Additionally, the Offering Memorandum went on to describe historical results and projections with respect to each geographic sales region. (PX 23 at 8; Tr. at 91:2–6). Specifically, it showed that sales for Latin America in 1992 were $9.3 million and in 1996 they were $18.7 million. (PX 23 at 8; Tr. at 91:7–10).

After Goldman Sachs' initial contact with SCJ, SCJ contacted them for further information regarding the acquisition. Goldman Sachs requested that SCJ put their follow-up questions in writing. (Tr. at 654:1–6). Shortly after July 21, 1997, SCJ had a teleconference with Goldman Sachs to discuss their follow-up questions. (Tr. at 654:71–13). During this call, SCJ wanted to know every place in the world that DowBrands had sales. In response, Goldman Sachs outlined the details of North America and Asian sales and with refer-

---

4. The second round of the auction involved data being made available in the form of a data room and a management presentation. (Tr. at 658:3–10). A data room is a room that has been assembled by a seller of a business which contains information that is pertinent for potential buyers to review, such as detailed financial statements, marketing studies and contracts. (Tr. at 658:5–10; 659:7–16).

ence to Western Europe they informed SCJ that sales were through a joint venture and for Latin America they informed SCJ that sales were through a master distributor and provided no detail concerning specific countries. (Tr. at 654:16–655:21).

On August 6, 1997, based solely on the information in the Offering Memorandum and the conference call with Goldman Sachs, SCJ submitted a preliminary, non-binding bid of between $900 million and $1 billion, which qualified it for the auction's second round and would enable SCJ to have some access to DowBrands' management information. (Tr. at 144:17–145:8; 643:23–644:5; 657:10–21).

### D. The First Data Room

The first data room was opened to SCJ on August 25, 1997 through August 26, 1997 in Indianapolis. Prior to visiting the data room, SCJ prepared a list of materials that it wanted to review, including financial data concerning the existing international business. (PX 66; Tr. at 657:22–658:17; 659:7–17; 665:2–666:22; 668:17–22). DowBrands prepared a Data Room Summary Index, which listed all the materials contained within the data room. (Tr. at 660:5–12). Among these materials were the Regional Financial Statements from Latin America which indicated past revenues for Latin America along with various expenses that the Latin American business had incurred. For example, the Regional Financial Statements indicated that in 1996, DowBrands incurred over $2.6 million in "marketing support" expenses for Latin America. (PX 62 at SC 7915; Tr. at 103:5–104:19; 106:14–107:8; 682:22–683:19; Esposito Dep. 68:19–71:10). The Regional Financial Statements also revealed the overall profitability of the different regions. For instance, DowBrands' U.S. operations lost $42 million and $27.5 million in 1994 and 1995 respectively, whereas, the Latin American business earned $5.3 mil-

lion and $3.1 million respectively. Additionally, the Regional Financial Statements indicated that in 1996, the Latin American operation earned $5.2 million. (PX 62; Tr. at 104:20–107:13; 1459:3–1461:20). Further, the Regional Financial Statements demonstrated that Latin American sales were slightly less than half of the Canadian sales but the Latin American profits were twenty-five to thirty percent higher than the Canadian profits. (PX 62; PX 318; PX 73; Tr. at 118:21–123:7, 1328:9–16).

### E. The Management Presentation

On August 26, 1997, SCJ attended a Management Presentation given by Dow-Brands' senior management which lasted approximately four to five hours, during which time various presentations were made concerning different areas such as marketing, sales, research and development and new products. Representatives of DowBrands and Goldman Sachs also attended the presentation. Carl Sycks, DowBrands' Vice President of International, presented the section relating to international business which lasted approximately fifteen minutes. (PX 32 at SC2013–14; Tr. at 91:11–93:4; 984:21–24; 985:20–986:3; 1142:22–1143:6; Kapur Dep. 115:18–116:8).

During this Management Presentation there was a slide shown which was labeled "International Opportunities" and contained a subheading "Large and Growing International Markets." (PX 32 at SC002014). This slide showed sales figures for home food products in Dow-Brands' international businesses including North America, Latin America, Western Europe, Asia Pacific and total global sales. *Id.* Additionally, another slide used in the Management Presentation entitled, "International Business Model", indicated that the Latin American sales and marketing divisions were headquartered in Miami.

(PX 32 at SC002016). Further, another slide that was shown outlined DowBrands' projected international performance for Latin America, Asia and Europe for the years 1997–2001. (PX 32 at SC002017). In addition, a slide which was entitled "Latin America" indicated that Latin America's projected gross sales figure for 1997 was $15.9 million, with projected profits of $4.8 million, and that there was a $700 million market growing at 4%+ per year. The slide also revealed that the combined potential market in Latin America for plastic bags and plastic wraps was $235 million. (PX 32 at SC002019). During the Management Presentation the issue of diversion was never raised or discussed. (Tr. at 767:11–18; 1059:4–1060:1; 1060:22–1061:7; 1144:2–5).[5]

### F. The Second Data Room

On August 29, 1997, SCJ requested supplemental due diligence, including a copy of all non-U.S. market research. (PX 46 at SC003326). On September 16, 1997 SCJ visited a second data room in Chicago which contained a new section in the Data Room Summary Index entitled "International". (PX 31 at SC001821). The second data room included updated Regional Financial Statements which were dated September 16, 1997 and DowBrands also provided, for the first time, data segregating its Latin American sales by "stock keeping unit" or "SKU", which provided a very detailed break down of the various products. (PX 181; PX 278; Tr. at 258:11–17; 663:7–22; 695:12–698:3;699:8–24). Both of these documents were labeled as copyable. The updated Regional Financial Statements also predicted sales for Latin America from 1997–2001. The statements predicted approximately $15.8 million in sales for 1997 and $17.4 million in sales for 2001. (PX 181 at SC017331). The SKU breakdown for Latin America indicated regular and recurring sales every month encompassing a number of products. (PX 278; Tr. at 695:12–696:8). Additionally, a Euromonitor Latin American Study was placed in the second data room[6] along with an executive summary of the Study and labeled "NC" or not copyable.[7] The Study indicated that no DowBrands HFM products were found in any of the stores surveyed in Latin America. (PX 19 at SC00404).

### G. Calculation of the Final Bid & Signing of the Agreement

After SCJ completed its due diligence concerning the materials in the second data room, SCJ began to prepare its final bid proposal for the acquisition of DowBrands' business. Employing a discounted cash flow analysis SCJ valued the entire DowBrands' business at $1.212 billion. SCJ's Board of Directors authorized a bid to be made up to $1.15 billion, plus 85% of the proceeds of divestitures in excess of $100 million (the "Divestiture Proceeds"), for the acquisition of DowBrands. (D.I. 95

---

**5.** During the Management Presentation, Marc English, SCJ's Director of Corporate Development, wrote "diversion?" next to one of the bullet points on the Latin American distributors in his copy of the written materials for the Management Presentation. (Tr. at 687–688; DX 62 at SC3743). Additionally, in a Memorandum summarizing key due diligence findings relative to DowBrands international business Mr. English wrote "Dow has two Latin American Distributors based in Miami—potential exists for watered goods." (DX 64 at SC3150).

**6.** This study was not placed in the first data room.

**7.** The data room setup was similar to a library environment. Only a certain number of people were permitted in the room at one time and materials were checked out and brought back. Additionally, some materials were copyable and others were not, and the materials had codes which indicated whether they could be copied. Copyable materials were labeled "C" and non-copyable materials were labeled "NC". (Tr. at 668:1–669:4.)

at 6 ¶ 23). SCJ initially offered $1.1 billion, plus 75% of the proceeds of divestiture in excess of $100 million, for DowBrands' assets. Following negotiations with DowBrands, the parties agreed that SCJ would pay $1.125 billion plus the Divestiture Proceeds for DowBrands' assets, which was $25 million less than SCJ's Board of Directors had authorized management to spend and $87 million less that SCJ's valuation of the assets it purchased. (D.I. 95 at 6 ¶ 24).

In preparing its final bid, SCJ employed a discounted cash flow analysis on an aggregate basis for all existing international sales and profits. SCJ did not prepare a separate discounted cash flow analysis at that time for the Latin American business, or any other region. For purposes of this litigation, SCJ seeks damages in the amount of $23.6 million, which it contends was the value of a Latin American business. SCJ arrived at its valuation by "backing out" or extracting the portion of the valuation of the entire existing international business that was specifically attributable to existing sales and profits in Latin America. (PX 181; PX 323; PX 324; Tr. at 704:12–714:18; 743:24–744:2; Anderson Dep. 41:14–42:20).

A few days before signing the Agreement, DowBrands delivered approximately fifty pages of materials to SCJ. Among these materials was a copy of a letter dated July 11, 1997, terminating Latin American distributor, Quality Line Products Inc., for diversion.[8] (DX 84; Tr. at 765:15–769:5; 1059:11–1060:2; 1060:22–1061:7; 1110:10–13; 1114:17–1115:8; 1262:21–1263:6). On October 27, 1997, the Agreement was signed. However, due to the fact that there were some overlap in brands between SCJ and DowBrands, the parties needed to get clearance from the Federal Trade Commission ("FTC") in order to discuss certain subjects concerning the overlapping brands. (PX 55; PX 58; Tr. at 131:2–132:24, 1166:22–1169:4; 1243:21–1244:13; 1475:8–12; 1476:3–12; Caron Dep. 33:6–34:8; O'Brien Dep. 373:19–376:3).

SCJ requested transition meetings with DowBrands, but its requests were refused due to the FTC restrictions. *See* Tr. at 1476:3–12 (establishes Mr. McLain admitting that he cannot deny that Mr. O'Brien requested meetings for sales and marketing and that he told him DowBrands could not meet due to FTC concerns). However, on January 12, 1998, after the FTC restrictions had been lifted, DowBrands met with SCJ representatives to discuss the international business. (Caron Dep. 66:21–68:9; 147:11–148:22; O'Brien Dep. 379:8–381). During this meeting Mr. Sycks provided Mr. Caron, SCJ's Global Category Manager for Home Storage, with sales figures, which were broken down by month and SKU, for each Latin American country and repeated the representations made from the Management Presentation. (PX 87 at SC9509–9556 & SC9574; Caron Dep. 150:13–29, 152:18–153:20; O'Brien Dep. 381:71–23). Also, during the course of this meeting Mr. Caron inquired about specifics of the Latin American sales; however, Mr. Sycks could not answer the specific questions posed and directed Mr. Caron to Jose Berdasco, who was the head of DowBrands' Latin American Sales Office. As a result, Latin America was only briefly discussed during this meeting (for about fifteen or twenty minutes). (PX 83; Tr. at 1004:23–1005:20; Caron Dep. 166:8–167:15; 170:1–171:16; 172:14–175:10; O'Brien Dep. 381:7–23).[9]

---

8. DowBrands did not mention the termination of Quality Lines during the Management Presentation on August 26, 1997 and never indicated that the accuracy of the September 16, 1997 Regional Financial Statements were affected by this termination.

9. Additionally on January 12, 1998 Mr. Francis, a DowBrands representative, attended a

On January 16, 1998, Mr. Caron met with Mr. Berdasco in Miami to review the Latin American business. Mr. Caron requested a list of retailers, retail distribution grids and sales data by region and country. Mr. Berdasco was not able to provide this specific information at that time but indicated that CPI, DowBrands' master distributor for Latin America, would have the information and that he would obtain it and forward it to Mr. Caron. (Caron Dep. 97:2–15; 104:20–106:15; 196:14–197:7; 201:13–19; PX 160; PX 161). On January 16, 1998, following the meeting in Miami, Mr. Caron sent an email to Patrick O'Brien [10], stating, "[w]ith Larry Behringer's help we're asking for detailed retail distribution charts for the major markets. [Mr. Berdasco] doesn't know where the products are being sold to and will ask the Costa Rican distributor for the information." (PX 151). However, Mr. Berdasco did not obtain and forward this information to SCJ prior to closing. (Tr. at 270:21–24).

## H. Post–Closing Events

The transaction closed on January 23, 1998. Four days after closing, on January 27, 1998, Mr. Caron, Larry Behringer, SCJ's Regional Sales Director for the Americas Region, and Mark Werner, SCJ's Marketing Director for Latin America, met with Mr. Berdasco in order to get the names of the retailers who carried DowBrands products in Latin America and the other information that Mr. Berdasco had promised to forward to them. (Tr. at 269:10–270:5; 270:21–271:10; 271:14–23;

Caron Dep. 234:20–235:16). Mr. Behringer asked Mr. Berdasco to describe the Latin American shipping process and he indicated that CPI took delivery of all products in Miami, which were shipped FOB Miami, and paid for in U.S. currency because DowBrands did not want to get involved in currency translation. Then, CPI shipped the products to the different countries and told DowBrands at a later date what product went to what country and also indicated that CPI paid 40% of the base price for the product. (Tr. at 272:21–273:12). Also, during this meeting, Mr. Behringer once again asked Mr. Berdasco for a list of retailers who sold DowBrands' products in Latin America and Mr. Berdasco indicated that he still had no information from CPI. (Tr. at 275:21–276:1). Additionally, during this meeting Mr. Behringer asked Mr. Berdasco if "it would be safe to assume that 80 to 90 percent of the business never left Miami and never left the United States" and Mr. Behringer, in his deposition testimony, indicated that Mr. Berdasco "walked over to his desk sort of smiled, [and] shrugged." (Tr. at 276:13–20). However, Mr. Behringer did not recall whether he specifically asked Mr. Berdasco about the products being diverted. (Tr. at 277:5–7).

After this meeting, Mr. Behringer asked the sales director of SCJ's Latin American subsidiaries to survey the retailers and determine which, if any, sold DowBrands' products. The survey took two to three weeks and found no DowBrands' products in Latin America other than some prod-

---

meeting with Mr. Caron and Mr. O'Brien. According to Mr. Caron, Mr. Francis brought a lot of materials to this meeting, and Mr. Caron and Mr. O'Brien were "pushed for time" and requested that Mr. Francis send them the supplemental materials. Mr. Francis did so on January 14, 1998, however, Mr. Caron was out of town for his meeting with Mr. Berdasco in Miami until after closing.

Included in these supplemental materials were the Euromonitor Latin American Study and a chart entitled the "D-word Chart." (Caron Dep. 159:7–22; Tr. at 1004:2–4; Caron Dep. 215:16–216:4).

**10.** Patrick O'Brien became the head of SCJ's home storage business after the acquisition of DowBrands.

ucts in Venezuela. (Tr. at 284:24–286:20; 287:1–21; 321:5–322:22; Cieza Dep. 125:24–130:9).

SCJ did not make any sales of Dow-Brands' products in Latin America from the date of closing until the end of its fiscal year which was five months later. SCJ had sold less than $1 million in bags and wraps in Latin America seventeen months after closing. (Tr. at 137:3–142:14; 270:21–271:13; 288:3–6; 318:14–319:13; 319:20–320:4; PX 221; PX 222).

### III. The Asset Purchase Agreement

The Asset Purchase Agreement at issue was signed on October 27, 1997 and the transaction closed on January 23, 1998. Under the Agreement, SCJ purchased certain assets and assumed certain liabilities relating to DowBrands' worldwide home food management products and home care products business. According to Section 10.06 of the Agreement, it is to be construed under the laws of the State of Delaware. Additionally, Section 10.10 of the Agreement states:

> 10.10 *Entire Agreement.* This Agreement (including the documents and instruments referred to in this Agreement) sets forth the entire understanding and agreement between the parties as to the matters covered in this Agreement and supercedes and replaces any prior understanding, agreement or statement of intent, in each case, written or oral, of any and every nature with respect to such understanding, agreement or statement. Purchaser acknowledges that it has conducted its own independent review and analysis of the Business and the Transferred Assets and that it has been provided access to the properties, records and personnel of Sellers for this purpose. In entering into this Agreement, Purchaser has relied solely upon its own investigation and analysis and the representations and warranties set forth in the Agreement and acknowledges that (a) none of Sellers or any of their respective Affiliates, directors, officers, employees, agents, representatives or advisors makes any representation or warranty, either express or implied, as to the accuracy or completeness of (and agrees that none such persons shall have liability or responsibility to it in respect of) any of the information, including without limitation any projections, estimates or budgets, provided or made available to purchaser or its agents or representatives, except as and only to the extent expressly provided for in this Agreement. Nothing in this Section 10.10 is intended to preclude any remedy for fraud or limit any right of Purchaser with respect to any breach or inaccuracy in any representation or warranty in this Agreement.

(D.I. 10, Ex. A, § 10.10). In a Memorandum Opinion dated August 17, 2001, the Court construed the last sentence of § 10.10 of the Agreement as two separate clauses. The first clause preserves the right of the parties to sue for fraud, and the second clause confirms the right to sue for misrepresentations in the agreement. (D.I. 99 at 35). Additionally, in the same Memorandum Opinion the Court recognized that under Delaware law, merger and disclaimer clauses do not prevent claims of fraudulent misrepresentation. (D.I. 99 at 36). Therefore, as determined by the Court, the Agreement does not preclude SCJ's claim for fraudulent misrepresentation. (D.I. 99, D.I. 100).

### IV. The Parties' Contentions

#### A. SCJ's Contentions

SCJ contends that there is no dispute that DowBrands represented the existence of a profitable business selling DowBrands

products to customers in Latin America. (D.I. 164 at 26). SCJ contends that Dow-Brands repeatedly represented that there was an existing business in Latin America that could be expected to yield $4 to $5 million in profit for the next five years. *Id.* Further, SCJ asserts that there was a clear and unambiguous message that there was no material diversion communicated to SCJ through the Offering Memorandum, the Management Presentation, the Regional Financial Statements and the other materials included in the data rooms. *Id.* at 27. Moreover, SCJ contends that Mr. McLain, the President and CEO of Dow-Brands, admitted that if there was any material diversion, which he characterized as diversion in excess of 10% of sales, SCJ should have been told. *Id.;* Tr. at 1453:19–1454:12.

Additionally, SCJ contends that Dow-Brands' representations regarding the existence and profitability of the Latin American business were false. In support of this contention, SCJ points to its lack of post-closing sales in Latin America. *Id.* Further, SCJ contends that DowBrands offered no competent and credible evidence to show that it had millions of sales in Latin America. For example, SCJ points out that DowBrands did not call any Latin American retailers as witnesses, nor did DowBrands depose or call CPI or any other Latin American distributor in its case, rather DowBrands relied exclusively on advertisements from the Bahamas, Puerto Rico and Venezuela which SCJ claims are hearsay and have no probative value. *Id.* at 28–29. In addition, SCJ contends that Mr. Berdasco, DowBrands' Sales Manager for Latin America, during a January 27, 1998 meeting, admitted that 80–90% of the products shipped to Latin America were diverted. *Id.* at 30. Specifically, SCJ argues that Mr. Behringer, a representative of SCJ, asked Mr. Berdasco whether it was safe to assume that 80% to 90% of the products destined for Latin America never left the U.S., and in response Mr. Berdasco smiled and shrugged his shoulders, which all of the SCJ representatives at the meeting interpreted as an acquiescence. *Id.* at 30. Additionally, SCJ claims that DowBrands is judicially estopped from claiming that their representations regarding diversion were false, given that there was a final judgment in the Cutie litigation which declares that CPI diverted products to the United States. *Id.* at 31.

SCJ further contends that DowBrands knew that its representations were false, or at the very least, made them with reckless indifference as to their truth. *Id.* SCJ argues that the record contains undisputed evidence that several senior managers, including Esposito, Kapur, Nestle, Campbell, Frey and Francis believed that little, if any, product ever reached Latin American retailers and consumers. *Id.* at 32. Additionally, SCJ contends that DowBrands knowingly tolerated diversion in Latin America in order to "make the numbers" because in 1994 and 1995 Latin America was the most profitable geographical segment of the business and even though it was aware of diversion in the region, eliminating such a profitable segment would mean failing to meet their yearly projections *Id.* at 33. As a result, SCJ contends that Mr. McLain instituted a policy of status quo during the sale process which is exemplified by the fact that the Latin American shipping policy remained "FOB Miami." *Id.* at 36–37. Further, SCJ contends that Mr. Francis' testimony, an employee of DowBrands for twenty-five years, establishes that DowBrands knew that there was widespread belief among senior DowBrands management that Latin American diversion was a problem and Francis' year long internal investigation confirmed that belief. *Id.* at 37.

SCJ also contends that DowBrands' historical experience with Latin American diversion undermines any claim that it lacked knowledge. *Id.* at 39. SCJ argues that this contention is supported by the fact that there were anti-diversion policies in effect such as changes in shipping terms, and when this change led to a drop in sales, the shipping terms were changed back to the status quo (FOB Miami) and sales rose. Further, SCJ contends that this historical problem with diversion was confirmed through internal memoranda within DowBrands since 1992. *Id.* at 39–40.

Also, SCJ contends that DowBrands' knowledge of diversion was confirmed prior to closing. For example, SCJ points to a November 1997 proposal forwarded by Annee Williams to Mr. Sycks which concerned requiring CIF shipping policies for Latin America. The memorandum projected that such a change "most likely will eliminate the majority of Latin America's business." (PX 140). Mr. Sycks responded that "[a]lthough I support the idea of moving to CIF shipping in Latin America, given the fact that we are being sold, I would recommend we not spend any time changing our method of operation in Latin America." (PX 140; D.I. 164 at 40–41). Additionally, SCJ asserts that three days before a meeting with SCJ to discuss transitioning the international business, Mr. Sycks received an email detailing that DowBrands had in the past several weeks received nine coupons indicating that shipments to CPI had been diverted to the U.S., and despite this information, SCJ contends that the Coupon Seeding Program's existence was not disclosed in this meeting to SCJ. (D.I. 164 at 41). Further, SCJ contends that the evidence ·demonstrates that, at the very least, DowBrands' management had serious doubts about whether there was an existing and legitimate business in Latin America, which independently satisfies the knowledge ele-

ment required for fraudulent misrepresentation. *Id.* at 41. SCJ argues that there is no dispute that DowBrands intended to induce SCJ to act in response to its representations regarding the Latin American business as part of its sales overtures and auction process which was designed to maximize the sales price. *Id.* at 42.

In addition, SCJ contends that they justifiably relied on DowBrands' representations regarding the existence and profitability of the Latin American business. Specifically, SCJ argues that Delaware law dictates that justifiable reliance requires that a reasonable person would consider such matters important in determining his course of action in a transaction. *Id.* at 42 (quoting *Craft v. Bariglio,* 1984 WL 8207 at *8 (Del.Ch. March 1, 1984)). With this standard in mind, SCJ contends that the evidence leaves no doubt that SCJ actually relied on DowBrands' representations regarding the Latin American business, in that SCJ's valuation of the Latin American business derived directly from SCJ's belief that the Regional Financial Statements, the Offering Memorandum, the Management Presentation and the data room documents depicted an existing Latin American business. (D.I. 164 at 43).

SCJ ·contends that its reliance on DowBrands' representations was reasonable and justifiable. *Id.* at 43. As an initial matter, SCJ argues that DowBrands and Goldman Sachs are extremely well-known and reputable companies on whom SCJ reasonably expected it could rely. *Id.* at 43–44. Further, SCJ contends that it had no business justification or legal obligation to "look behind" DowBrands' representations regarding Latin America to test its veracity concerning the Latin American business. Moreover, SCJ points out that under Delaware law the purchaser of a business has no duty to investigate the accuracy of the representations of the sell-

er concerning its profitability even when there is an opportunity to do so. *Id.* at 45 (quoting *Craft,* 1984 WL 8207 at *8).

SCJ also contends that DowBrands' representations of an existing, profitable and predictable Latin American business were material. In support of this contention, SCJ asserts that despite the relatively small size of the Latin American business, it was extremely important to DowBrands' profitability. (D.I. 164 at 45). For example, SCJ contends that the Regional Financial Statements, demonstrate that in 1993, 1994, and 1995, years in which the U.S. business suffered significant operating losses, Latin America was the most profitable segment of DowBrands' business. *Id.* at 45–46; PX 62. Additionally, in 1996, Latin America accounted for over 10% of DowBrands' global operating income, a fact that DowBrands' materiality expert, agreed could reasonably be considered material to the transaction. *Id.* at 45–46. SCJ further contends that it was an international consumer products company with a stated strategy of entering into a global category. *Id.* at 46. SCJ argues that the Latin American business was also important to other potential bidders including Clorox, one of SCJ's principal competitors, who had a stated objective of expanding internationally and specifically in Latin America, which made the representations by DowBrands all the more important to SCJ. *Id.* at 46–47.

Finally, SCJ contends that it is entitled to the benefit of its bargain. *Id.* at 47. Specifically, SCJ contends that under Delaware law, the most common and accepted measure of damages standard gives the victim of fraud the benefit of the bargain which "'puts the plaintiff in the same financial position it would have been in if the defendant's representations had been true.'" *Id.* (quoting *Stephenson v. Capano Development, Inc.,* 462 A.2d 1069, 1076 (Del.1983)). In support of its position SCJ

relies on, *Tam v. Spitzer,* 1995 WL 510043 (Del.Ch. August 17, 1995), where the plaintiff purchased a data processing plant from the defendant, calculating the entire business using a discounted cash flow analysis. (D.I. 164 at 47); *Tam v. Spitzer,* 1995 WL 510043 (Del.Ch. August 17, 1995). After the transaction closed, plaintiff discovered that the defendant had misrepresented the future revenues that could be expected from the business' key customer. (D.I. 164 at 47–48; *Tam,* 1995 WL 510043, at *11–12). Applying the benefit of the bargain rule, the court used the same discounted cash flow methodology and valuation that was used to calculate the purchase price, but then deducted the revenue and expenses attributable to that customer. (D.I. 164 at 47–48; *Tam,* 1995 WL 510043, at *11–12).

SCJ contends that when doing the same calculation, it quantified the Latin American business to be valued at $23.6 million. (D.I. 164 at 48; Tr. at 155:9–155:22; 715:13–716:1). In reference to the functional expense part of the calculation, which DowBrands disputes, SCJ contends that Mr. English explained that he calculated this number in the same manner as SCJ's original valuation and even increased it in order to be conservative and that the percentage differed from the business as a whole because DowBrands operated Latin America as an incremental business. (D.I. 167 at 23; Tr. at 711:14–712:22). As to depreciation, which DowBrands also disputes, SCJ contends that Mr. Dunbar, DowBrands' expert, agreed that SCJ would have appropriately subtracted that number if the depreciation was included in the cost of goods sold and as both English and Anderson testified, depreciation was included in the cost of goods sold. (D.I. 167 at 23–24; Tr. at 1395:19–1396:4; 713:13–21; Anderson Dep. 122:4–17). Based on this, SCJ contends that it is entitled to the benefit of its

bargain which it contends is $23.6 million. (D.I. 164 at 48–50; D.I. 167 at 23–24).

## B. DowBrands' Contentions

In response, DowBrands contends that they did not make any misrepresentations about levels of diversion in Latin America. (D.I. 165 at 6). Specifically, DowBrands contends that SCJ, like others in the business, understood that diversion is always an issue for a consumer products company, and that witnesses for DowBrands and SCJ agreed that the existence of diversion was difficult to prove or quantify. *Id.* Additionally, DowBrands argues that before the Coupon Seeding Program in 1997, DowBrands had failed to find a single instance of diversion involving DowBrands' master distributor for Latin America, CPI, and that although DowBrands employees had personal opinions regarding diversion, there was no actual proof of diversion. *Id.* at 7. Also, DowBrands argues that two employees of DowBrands who went to work for SCJ could not quantify how much diversion occurred until they obtained the results of the Coupon Seeding Program, for which the final results were not known until after Closing. *Id.;* (Tr. at 408; 424–426; 608; PX 223).

Further, DowBrands contends that the Coupon Seeding Program's results established that diversion in Latin America was 40% of the level of diversion that existed in DowBrands' European and Pacific businesses because the coupon return rate in Latin America was just 14%, while the return rates in the other regions were 35% and 37%. (D.I. 165 at 8; DX 14 at SC11415–18; PX 223; Tr. at 426–27; 435–436). Also, DowBrands points to David Bell's testimony, an expert from the Wharton School of the University of Pennsylvania, who opined that based on the high likelihood that stockers in the United States would redeem any $50 coupons that were found there, the Coupon Seeding results showed that there was 15–20% diversion. (D.I. 165 at 8; Tr. at 803–827; DX 274).

Moreover, DowBrands contends that SCJ's admissions and other evidence at trial were consistent with the conclusion that most of DowBrands' Latin American sales were not diverted including: (1) the fact that SCJ admitted before trial that DowBrands' products were sold at least in Venezuela and Puerto Rico. (D.I. 139 at 9); (2) store fliers advertising DowBrands products at retail outlets in Puerto Rico, Venezuela and a few other Latin American countries were found in DowBrands' files in its Miami sales office.[11] (Tr. at 908–919; 923–26; PX 186 at SC18925–27 (Bermuda); PX 199 at SC19867, 19881 (Bahamas); PX 202 at SC20132, 20137 (Guatemala); PX 216 at SC20723, 20748 (Puerto Rico); PX 219 at SC20990, 21016, 21026, 21028, 21031 (Venezuela)); (3) SCJ's own store checks in Venezuela also found DowBrands' products there. DX 87 at SC2111, 2121; and (4) Jose Berdasco, and Samuel Vera, who also worked in the Miami office, saw products on store shelves in Latin America and had photographs from such stores. (D.I. 165 at 9; Berdasco Dep. 116–117; Tr. at 1021–22; DX 19).

Additionally, DowBrands contends that Latin American distributors also provided DowBrands with evidence of the products reaching Latin America in the form of ocean bills of lading and letters of credit issued through banks in Latin America. (D.I. 165 at 9–10; DX 178; PX 183 at SC18789; PX 186 at SC18968–72; PX 199 at SC19838; PX 201 at SC19969). Further, DowBrands argues that before the Coupon Seeding Program, it tried to identify diversion in international sales primar-

---

**11.** DowBrands asserts that since SCJ moved each of these ads into evidence, they have waived their hearsay objection. (D.I. 165 at 9).

ily by tracking lot codes of products found at U.S. retailers, and that in the single instance where a lot code found in the U.S. was allegedly shipped to a Latin American distributor, DowBrands' employees investigated the matter and personally observed the product in question still in Latin America. (D.I. 165 at 10; Tr. at 939–940; 1017–1022; DX 191).

DowBrands also contends that SCJ has not demonstrated that it had the requisite scienter to sustain its claim. (D.I. 165 at 10). First, DowBrands argues that Mr. McLain was compensated by a formula based on the overall profitability of the business as a whole, not on any one segment of the business. (D.I. 165 at 10). Specifically, on April 11, 1997, Mr. McLain sent an email to Ms. Esposito and Mr. Sycks and advised them that concerns about diversion had created a morale problem. (PX 9). McLain noted that he disagreed with the view that there were high levels of diversion, and asked for a recommendation to address the problem. *Id.* Additionally, DowBrands contends that around this time Mr. McLain told several sales managers that he would shut down the businesses the managers suspected of diversion if the managers would add the supposed volumes of diverted sales to their sales targets; however, no one accepted this challenge. (D.I. 165 at 10; Tr. at 1183–84; Tr. at 1442–44).

Also, DowBrands contends that SCJ did not reasonably rely on any misrepresentation concerning the amount of diversion in Latin America. (D.I. 165 at 32). For example, DowBrands argues that Mr. Behringer's testimony cannot be reconciled with the evidence. (D.I. 165 at 15). Mr. Behringer testified that after Closing he conducted a survey which revealed, to his surprise, that no DowBrands products were found on the shelves of any Latin American stores surveyed. DowBrands argues that before the Offering Memoran-

dum, in the Spring of 1997, Penny McIntyre—SCJ's acquisition team member in charge of international marketing issues—made a "virtually identical study" of SCJ's subsidiaries to determine whether SCJ customers carried DowBrands products and this survey, with the exception of Venezuela, also found no DowBrands' products on any stores in Latin America. *Id.* Therefore, DowBrands contends that SCJ could not have reasonably expected to find DowBrands' products in stores in Latin America outside of Venezuela. (D.I. 165 at 15, 34–35). Also, DowBrands notes that before signing the Asset Purchase Agreement, it informed SCJ that it terminated Quality Lines, one of its Latin American Distributors, for diversion, and that SCJ never asked about the termination or the levels of diverted product. (D.I. 165 at 11). Additionally, DowBrands asserts that they placed the Euromonitor study along with an executive summary in the data room which indicated that no DowBrands' products were found in a spot check of Latin American stores. *Id.* DowBrands also contends that these materials were given to SCJ at a meeting on January 12, 1998 and that additional copies were subsequently sent to SCJ on January 14, 1998. *Id.*

In addition, DowBrands contends that SCJ failed to inquire about diversion, despite attending fifty in-person meetings with DowBrands' employees between the signing of the Agreement and the January 27, 1998 Closing. *Id.* For example, DowBrands contends that at the January 12, 1998 meeting, SCJ asked why DowBrands' reported 1997 international sales were lower than the projections presented earlier at the Management Presentation, and in response, Mr. Sycks stated that the reasons for the shortfall were that "DowBrands 'fired one of two key re-export brokers [Quality Line] in mid year' and 'capped the total amount of sales to L.A. to

control diversion.'" (D.I. 165 at 13 (quoting DX 293; Tr. at 971–975)). Despite this, DowBrands argues, SCJ still made no inquiries regarding diversion. (D.I. 165 at 13). DowBrands contends that under Delaware law, where there is a "red flag", sophisticated business persons have a duty to investigate, and that SCJ's failure to investigate in the instant case precludes a finding that SCJ reasonably relied on DowBrands' representations. *Id.* at 37.

DowBrands also attacks Mr. Frey's testimony regarding the results of the Coupon Seeding Program. Specifically, DowBrands asserts that their expert, David Bell, concluded that the program demonstrated a 15–20% rate of diversion in Latin America. *Id.* at 14. DowBrands argues that virtually all of the redeemed coupons from shipments to CPI came in very late, and that CPI, began to divert products only after the October 27, 1997 announcement that DowBrands had been sold, and only after CPI "sensibly concluded that, having heard nothing from SCJ about plans to transition the business, the contract was not likely to be renewed." (D.I. 165 at 15; Tr. at 1032–1039).

Moreover, DowBrands contends that under Delaware law opinions such as Mr. Francis' and other DowBrands' employees concerning diversion cannot be the basis of a fraud claim. *Id.* at 16. In addition, DowBrands argues that Mr. Berdasco's "nonverbal response" in regard to whether 80–90% of the products ever leave the U.S. was not a shocking confession, which is exemplified by the fact that no one at the meeting asked any follow-up questions or asked for an explanation. *Id.* at 17.

Next, DowBrands contends that its representations regarding the Latin American Business were not material to the parties' transaction. *Id.* at 18. In regard to materiality, DowBrands points to a Securities and Exchange Commission ("SEC") guideline, where the SEC recognizes that a quantitative rule of thumb, such as 5% is an appropriate initial step in assessing materiality. (D.I. 165 at 28). However, DowBrands contends that the SEC recognizes that there must also be a qualitative assessment which looks at factors such as whether the misstatement arises from an item capable of precise measurement, whether the misstatement masks a change in earnings, or whether the misstatement concerns a segment of the registrant's business that has a significant role in operations or profitability. (D.I. 165 at 28). Applying this standard, DowBrands argues that SCJ placed no value on DowBrands' Home Care Products business ("HC") because it already sold HC products in Latin America. Thus, DowBrands contends, the only relevant Latin American sales related to HFM products, which were just 1.6% of total sales in 1996, and were estimated to be 1.2% of DowBrands' total sales and that sales were projected to decline to 1% of total sales by 2001. (D.I. 165 at 19, 28; PX 23, SC297–928, SC998). Therefore, DowBrands argues that the Latin American business fails the quantitative step in the materiality assessment because it falls well below the 5% rule of thumb. (D.I. 165 at 28).

Additionally, DowBrands contends that based on the fact that the Latin American business was such a small segment of the business, disclosure documents given to SCJ and other bidders "devoted scant attention to that market." (D.I. 165 at 20). For example, DowBrands points out that: (1) there were only seven sentences (on pages 26 and 41) in the text of the 89-page Offering Memorandum devoted to Latin America; PX23 at SC948, SC963; (2) the written 200-page Management Presentation contained a 13-page section entitled "International Opportunities," only one page of which addressed Latin America exclusively and only four other pages of which contained any reference to Latin

America; PX32 at SC2013–25 and; (3) of the several hours spent at the Management Presentation, only a few minutes were devoted to the entire international segment, and the break out session for international only lasted a few minutes. (D.I. 165 at 20; Tr. at 92, 203, 986).

Further, DowBrands contends that SCJ and its expert effectively conceded that the Latin American HFM sales were not material. (D.I. 165 at 21). For example, DowBrands points to Penny McIntyre's deposition testimony, who it contends admitted that the consensus of SCJ management in formulating its initial bid was that the international segment of the business was not material. *Id.;* McIntyre Dep. 136–137. Additionally, DowBrands argues that Mr. Francis testified that Latin American sales were not significant because they were small in both relation to the size of DowBrands and the size of the Latin American market. (D.I. 165 at 21; Tr. at 579–80). Also, DowBrands points to the deposition testimony of Lawrence Rittenberg. Initially hired by SCJ as an expert but never called at trial, Mr. Rittenberg could not opine whether the levels of diversion evidenced by the record were material, but stated that 90% diversion would be material, whereas, 40% diversion would not be. (D.I. 165 at 22; Rittenberg Dep. 80–83).

DowBrands argues that SCJ's actions confirm that it did not consider the Latin American business or any diversion that might have occurred to be material. (D.I. 165 at 22). Specifically, DowBrands argues that SCJ was complacent on the issue of diversion, because even after receiving notice that one of the Latin American distributors was terminated for diversion, SCJ never asked any questions regarding diversion. *Id.* at 23. Additionally, DowBrands argues that SCJ recognized that Latin America was an opportunistic business, and after reviewing the Offering

Memorandum, one of the senior executives at SCJ, Joseph Malloff, stated in a memorandum that "they are really no where in terms of international business." *Id.* at 24; DX73 at SC1811.

In regard to damages, DowBrands argues that SCJ did not suffer any damages, and that SCJ improperly assumed that the diverted sales were worth nothing at all. (D.I. 165 at 39). Additionally, DowBrands argues that SCJ would not have changed its bid by $23.6 million had it known that there was diversion and even if they had, they did not suffer any damages. *Id.* at 41. For example, DowBrands argues that even if SCJ's bid were reduced by $23.6 million, SCJ's final bid would still have been: (1) $63.4 million below SCJ's valuation and (2) within the range authorized by SCJ's Board. *Id.* Also, DowBrands asserts that there is no conclusive testimony that if SCJ had learned of diversion, it would have changed its bid at all. *Id.* Further, DowBrands contends that the overall business performed far better than SCJ assumed it would at the time of the bid; where the 1998 sales were $45 million above what SCJ had expected and the operating profit was $14 million over what SCJ had expected. *Id.* at 42; Tr. at 229–230; DX 101 at SC16119. Moreover, DowBrands contends that SCJ's damages calculation contains numerous computational errors including that SCJ assumes a functional expenses adjustment of 2% of sales, rather than an MEA assumption of 6%. (D.I. 165 at 42). Additionally, DowBrands asserts that SCJ's adjustment for depreciation in its damages calculation was an error because it was not included in the original calculation and overly inflated the end product. (D.I. 165 at 42–43). Also, DowBrands argues that SCJ's claimed damages of $23.6 million represent SCJ's total valuation of $1.212 billion attributed to Latin America; however, SCJ only paid $1.125 billion for DowBrands which was

93% of the total valuation. Therefore, SCJ's damages calculation must be reduced to reflect the ratio of the purchase price to the valuation. *Id.* at 43; DX 294. Moreover, DowBrands argues that even under the benefit of the bargain rule, SCJ is only entitled to recover net damages, and here the overall business did not suffer any net damages. Therefore, DowBrands argues that SCJ cannot recover anything. (D.I. 165 at 45).

Finally, DowBrands argues that the Court should not consider the hearsay that underlies many of SCJ's principal contentions. *Id.* at 48. For example, DowBrands argues that the testimony of Mr. Francis and Mr. Frey regarding Mr. Campbell, Mr. Kapur and Mr. Nestle were not admissions by a party opponent under Federal Rule of Evidence 801 ("FRE 801") because SCJ has not proven that Campbell, Nestle and Kapur had any responsibility for DowBrands' Latin American business. *Id.*

Additionally, DowBrands argues that Mr. Behringer's testimony regarding the results of the post closing survey is also inadmissible hearsay and unsupported by any documentary evidence. *Id.* at 49. Also, in regard to PX 252, an internal DowBrands' Memorandum from 1992 concerning domestic diversion, DowBrands argues that this document is inadmissible hearsay and irrelevant. First, DowBrands argues that this document is irrelevant because it dealt with domestic diversion, and was written by James Holtshouse, who was General Manager for North America and whose job did not concern Latin America. Also, DowBrands claims that SCJ did not establish that these were admissions by a party-opponent or fall within the business records exception to the hearsay rule, or that the double-hearsay document qualifies under any other hearsay exception. *Id.* Finally, DowBrands claims

that the same issues arise with respect to PX 246, PX 247 and PX 251. *Id.*

## V. APPLICABLE LEGAL PRINCIPLES

The instant action is a diversity case, and therefore, Federal Rules govern procedure while substantive issues are governed by Delaware law. *Erie R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Additionally, the parties Agreement indicated that it should be construed under Delaware law. (Agreement at § 10.06).

■ Under Delaware law, a party asserting a claim of fraudulent misrepresentation must prove by a preponderance of the evidence that: (1) the defendant made a false representation, respecting the transaction; (2) the defendant knew that the representation was false or made it with reckless indifference as to the truth; (3) the defendant made the representation with the intention of inducing the plaintiffs to act upon it; (4) the plaintiff's action or inaction was taken in justifiable reliance on the representation; and (5) the plaintiff was damaged as a result of such reliance. *See Stephenson v. Capano Dev., Inc.,* 462 A.2d 1069, 1074 (Del.1983); *Ranch v. Lynch,* 89 A. 134, 136 (Del.Super.Ct.1913). In addition, SCJ must establish that DowBrands' representations regarding diversion in Latin America were material. *See E.I. Du Pont De Nemours & Co. v. Florida Evergreen Foliage,* 744 A.2d 457, 462 (Del.1999).

## VI. FINDINGS OF FACT AND CONCLUSIONS OF LAW

After considering the applicable law, the relevant facts, and the parties' contentions, the Court concludes that SCJ has proven by a preponderance of the evidence that DowBrands committed fraud in regard to its representations concerning diversion in Latin America. Specifically, the Court

concludes that SCJ proved all the elements of fraudulent misrepresentation by a preponderance of the evidence. The Court will address each element of fraudulent misrepresentation below.

## A. False Representations Made by the Defendant

■ The Court concludes that DowBrands did make representations to SCJ, indicating that there was an existing and profitable Latin American business. For example, the financial statements in the first data room indicated that DowBrands' U.S. operations lost $42 million and $27.5 million in 1994 and 1995 respectively, whereas, the Latin American business earned $5.3 million and $3.1 million respectively. Additionally, a slide that was used in the Management Presentation outlined DowBrands' projected International performance for Latin America, Asia and Europe for the years 1997–2001. (PX 32 at SC002017). Also, a slide which was entitled "Latin America" indicated that the projected gross sales in Latin America for 1997 was $15.9 million, with projected profits of $4.8 million, that there was a $700 million market growing at 4%+ per year and that the combined potential market in Latin America for plastic bags and plastic wraps was $235 million. (PX 32 at SC002019). Although there was a Euromonitor Report, which indicated that no DowBrands' products were found during a spot check of Latin American stores, placed in the second data room[12], the Court concludes that all of the other representations contained in the Offering Memorandum, the Management Presentation, the first and second data rooms and all of the meetings indicating that there was an existing Latin American business outweigh the placement of the Euromonitor report in the second data room and amount to representations that there was an existing and profitable Latin American business.

Next, the Court concludes that DowBrands' representations that there was an existing and profitable Latin American business were false. Although DowBrands contends that there was a profitable Latin American business, the record does not support such a contention. First, DowBrands relies on its expert David Bell, who testified that the results of the Coupon Seeding Program indicated that there was 15–20% diversion in Latin America. Next, DowBrands asserts that Mr. Francis's testimony that there was no real Latin American business, is not consistent with the report he made after an extensive investigation which only has one page on diversion and does not indicate that the business is a sham. Additionally, DowBrands argues that its employees opinions on their suspected level of diversion cannot be the basis of a fraud claim.

Despite these contentions, the Court finds the fact that SCJ did not make any sales of DowBrands' products in Latin America from the date of closing until the end of its fiscal year which was five months later and that they sold less than $1 million in bags and wraps in Latin America seventeen months after closing persuasive. (Tr. at 137:3–142:14; 270:21–271:13; 288:3–6; 318:14–319:13; 319:20–320:4; PX 221; PX 222). Additionally, in regard to David Bell's testimony concerning the 15–20% level of diversion as ascertained through the Coupon Seeding Program, the Court does not find this testimony credible due to the fact that Mr. Bell relies on the assumption that a

---

**12.** The Court recognizes that the Euromonitor Report was brought to a January 12, 1998 meeting with SCJ along with other materials, but was never specifically discussed in that meeting. The materials were later sent to SCJ; however, Mr. Caron did not receive them until after closing because he was out of town. (Caron Dep. 159:7–22; Tr. at 1004:2–4; Caron Dep. 215:16–216:4).

stocker would redeem the coupon if diverted which he called the—the "conditional probability of redemption." (Tr. at 807:3–9; 826:20–24; 855:17–856:4). This critical probability of redemption was not ascertained mathematically or empirically, but was identified using Mr. Bell's informed judgment. (Tr. at 856:8–19). Additionally, his assumed redemption rate differs dramatically from other rates experienced by other companies with similar programs. (Tr. at 853:4–855:5). Further, Mr. Bell was more familiar with supermarket coupons rather than the type of coupons at issue. (Tr. at 795:7; 808:10–14). Also, Mr. Bell assumed that there was a hundred percent chance that the coupon got to the stocker, while Mr. Frey, whom Mr. Bell relied on for most of his information about the program, testified that fifty percent (50%) or less of the Latin American coupons made it to the stockers due to the fact that there was no orientation that was critical to the products in this case, so there was a good chance they would open the box from the other end and never see the coupon. (Tr. at 795:7; 808:10–14; 837:4–13; 813:18–21; 859:20–860:9; 861:2–13; 858:2–5; 838:9–22; 862:15–19; 377:21–379:5; 864:14–20). Based on these facts, the Court does not find Mr. Bell's testimony regarding levels of diversion credible.

Additionally, the Court finds that DowBrands did not present any credible evidence that there was in fact an existing and profitable Latin American business. DowBrands relied on advertisements found in its Miami Office, which the Court does not find credible, rather than producing Latin American retailers. Further, Mr. Berdasco's "shrug and smile" in response to the suggestion that 80–90% of the products never left the U.S., in and of itself does not confirm that there was no Latin American business. However, the response does lend support to the diversion finding in conjunction with the other supporting evidence. Finally, the Court finds the existence and result of the lawsuit against Mr. Cutie, the principal of CPI persuasive. First, in its Complaint DowBrands alleged that CPI had "regularly and systematically caused the diversion of DowBrands' products" and that "this practiced commenced at [the] inception of the subject distribution agreement until its termination." (PX 295 ¶ 9). DowBrands obtained a final judgment in this litigation which indicated that CPI did divert products from Central and South America to the United States. (PX 297). Given that DowBrands terminated Quality Lines for diversion in July 1997 and terminated CPI, its only remaining Latin American Distributor, amidst a lawsuit and allegations of regular and systematic diversion from the inception of their agreement, the Court finds that there was no real profitable Latin American business apart from diversion.[13] Therefore, the Court concludes that DowBrands representations that

---

13. If DowBrands argued that significant diversion by CPI did not occur until after the announcement of SCJ's acquisition, it would be judicially estopped from doing so because in its Complaint in the Cutie litigation it alleged that diversion occurred from the inception of the agreement until its termination. (D.I. 165 at 15). Judicial estoppel applies if: (1) the party to be estopped is asserting a position that is irreconcilably inconsistent with one he or she asserted in a prior proceeding; (2) the party changed his or her position in bad faith, i.e., in a culpable manner threatening to the court's authority or integrity; and (3) the use of judicial estoppel is tailored to address the affront to the court's authority or integrity. *Montrose Med. Group Participating Sav. Plan v. Bulger,* 243 F.3d 773, 777–78 (3d Cir.2001). Here, the inconsistency prong is satisfied because DowBrands argued in its brief that significant diversion by CPI began only after the acquisition announcement in October of 1997, while their Complaint in the Cutie litigation stated that diversion occurred at the inception of their agreement until its termination. The

there was an existing and profitable Latin American business were false.

## B. DowBrands Knew that the Representations Were False or At the Very Least Made Them With Reckless Indifference As to Their Truth

The Court finds that DowBrands knew that their representations that there was an existing and profitable Latin American business were false or at the very least made them with a reckless indifference as to their truth. For example, DowBrands Management including Mr. Francis, Mr. Kapur, Mr. Warren, Mr. Campbell, Mr. Nestle and Ms. Esposito were aware of the diversion in Latin America. (Tr. at 366:8–18 (noting that Mr. Nestle, of the U.S. sales force, indicated that he felt that 100% of product bound for Latin America was diverted); Tr. at 531:22–532:9 (noting that Mr. Wales was shown a letter that indicated that they weren't finding any products on Latin American shelves and stated that they needed to change distributors); Tr. at 533:11–535:20 (noting that Mr. Campbell was always concerned about whether the Latin American business was a real business); Campbell Dep. 30:14–22 (acknowledging that he had conversations about diversion with key business people at Dow including Mr. Francis, Ms. Esposito, Mr. Nestle); Tr. at 549:21–552: (stating that Mr. Kapur thought that Dow would have to live with diversion like other companies and that DowBrands' products were probably not in military stores as Mr. Berdasco had indicated); Kapur Dep. 89:6–12 (acknowledging that there was diversion in Latin America in 1997); Tr. at 567:21–568:16 (stating that Mr. Sycks said he was not surprised that no DowBrands' products were found in Latin American stores); Berdasco Dep. 87:20–88:22 (noting that Ms. Esposito knew that there was an ongoing diversion problem in Latin America)).[14]

---

second prong is satisfied because DowBrands "strongly suggests" that there was no diversion until after October 1997 in bad faith, to argue for its own position after it already obtained a judgment in its favor with an inconsistent argument. Finally, the use of this doctrine will preserve the integrity of the judicial process in that parties should not be able to change their position based on what parties are litigating against. Accordingly, DowBrands is estopped from asserting this inconsistent argument.

**14.** Although DowBrands contends that these statements are inadmissible hearsay, the Court concludes that they are admissible as admissions by a party opponent under FRE 801(d)(2)(D). Specifically, the Court finds that the statements are " statements [made] by the [DowBrands'] agent[s] or servant[s] concerning a matter within the scope of the agency or employment, made during the existence of the relationship." FRE 801(d)(2)(D). Also, the Court finds that the statements of Ms. Esposito, Mr. Nestle, Mr. Wales, Mr. Kapur and Mr. Campbell were all made within the scope of their employment. For instance, Mr. Kapur was the Vice President of Strategic Planning and had responsibility for the entire company, therefore knowledge about Latin America was within his scope of employment. (Tr. at 1088:10–15). Also, Mr. Wales, as General Counsel, had responsibility for the diversion issue. (Tr. at 1203:8–14; 1204:22–1205:3). Further, Mr. Nestle had responsibility for the U.S. sales force, and therefore, had to deal with the effects of diversion. (Nestle Dep. 5:17–7:3). Also, Mr. Sycks and Ms. Esposito both had responsibility for the Latin American business at different times, and therefore, their statements are within the course and scope of employment. Additionally, the Court finds that PX 252 written by James Holtshouse, the former General Manager of North America, is an admission by a party opponent within the purview of FRE 801(d)(2)(D), and therefore, nonhearsay because the Memorandum concerned domestic diversion, which was in the scope of his employment and was relevant to a general background of diversion at DowBrands. Additionally, the Court finds that PX 246, PX 247 and PX 251 are admissions by a party opponent within the purview of FRE 801(d)(2)(D), and therefore, admissible.

The Court also finds that DowBrands own internal investigation revealed that there was no real business in Latin America. For instance, Mr. Francis undertook a year long investigation of the Latin American business and by the end of the project, Mr. Francis had reasonably concluded that there was no real business in Latin America, a conclusion which he conveyed to Ms. Esposito, Mr. Kapur, Mr. Berdasco, Mr. Wales, Mr. Campbell and Mr. Sycks. By June of 1997, if Mr. Francis had been asked to quantify the amount of product that he believed actually went to customers in Latin America he testified that he would have put it at zero. (Tr. at 542:14–543:11; 565:17–566:9; 568:17–569:15; 621:20–622:6; 628:11–629:9). Additionally, Mr. Frey, after researching and developing the Coupon Seeding Program, concluded that the results of the program received before Closing proved that there was significant diversion in Latin America. (Tr. at 386:21–387:2; 392:20–393:22; 1156:18–1157:9; 1158:11–16; 1173:15–1174:14).

Also, DowBrands historical experience with diversion, especially in Latin America, indicates that DowBrands was aware that there was significant diversion in Latin America. In addition, after the signing of the Agreement DowBrands learned additional facts that confirmed that there was significant diversion in Latin America, none of which were disclosed to SCJ. For example, in November 1997, Annee Williams forwarded to Mr. Sycks, a proposal to require CIF shipping in Latin America. The proposal indicated that this measure would likely eliminate most of the Latin American sales, and Mr. Sycks responded by stating, "given the fact that we are being sold, I would recommend we not spend any time changing our method of operation in Latin America." (PX 140). Moreover, three days before a transition meeting with SCJ on January 12, 1998, Mr. Sycks received an email detailing that DowBrands had in the past several weeks, received nine coupons indicating that shipments to CPI had been diverted to the U.S. Despite this, the existence or progress of the Coupon Seeding Program was never disclosed to SCJ at the January 12, 1998 meeting. Based on this record, the Court concludes that DowBrands knew that its representations concerning the Latin American business were false or at the very least made them with reckless indifference as to their truth or falsity.

### C. DowBrands Intended to Induce SCJ to Act in Response to its Representations

Based on the record evidence, the Court concludes that DowBrands intended to induce SCJ to act in response to its representations. For example, the information in the Offering Memorandum was intended to solicit a preliminary bid to qualify for the auction's second round. Further, the information contained in the Management Presentation and the first and second data rooms, which the Court has already concluded contained false representations regarding the profitability of the Latin American business, was intended to solicit a final bid from SCJ. Moreover, the information gained in the transitional meetings prior to closing was intended to induce SCJ to close the transaction. Based on this, the Court concludes that DowBrands intended that SCJ submit a final bid in response to its false representations regarding the Latin American business.

### D. SCJ Justifiably Relied on DowBrands' Representations Regarding the Existence and Profitability of the Latin American Business

 The Court concludes that SCJ justifiably relied on DowBrands' representations regarding the existence and profitability of the Latin American business. Under Delaware law "justifiable reliance

requires that the representations relied upon involve matters which a reasonable person would consider important in determining his course of action in the transaction in question." *Craft v. Bariglio,* 1984 WL 8207 at *8 (Del.Ch. March 1, 1984). Section 538 of the Restatement (Second) of Torts states, materiality is subsumed within this element. Restatement (Second) Torts, § 538. A matter is material if "a reasonable man would attach importance to its existence in determining his choice of action in the transaction in question." *Id.* The record evidence demonstrates that SCJ's reliance on DowBrands' representations concerning the Latin American business was reasonable and justifiable. Additionally, the Court concludes that DowBrands' representations were material, that is, they related to important information that any reasonable purchaser would want to know.

Although DowBrands contends that Latin American sales were not material because sales were below the quantitative 5% rule of thumb as outlined by the SEC, the Court concludes that this contention is unpersuasive. First, the SEC has specifically stated that "exclusive reliance on this or any other percentage or numerical threshold has no basis in accounting literature or the law." SEC Accounting Bulletin No. 99, 1999 WL 1123073 (August 12, 1999). Moreover, the SEC emphasizes that both quantitative and qualitative factors must be considered. *Id.* at *3. Also, the Court recognizes that sales as well as profits should be considered in the materiality analysis. *See* Tr. at 123:8–14; 236:2–237:12 (noting that "bankable profit" is important in valuing a business); Tr. at 240:15–24 (noting that if a business has $30 million in sales and $6 million of steady profit, SCJ would use profit to calculate the value). Additionally, the Court recognizes that SCJ calculated the value of the business based on a discounted cash flow, which was profit, adjusted for non-cash

expenses such as depreciation, projected to be received by the business. (Tr. at 148:23–149:14).

In regard to materiality, the Court concludes that DowBrands' Latin American sales and profits were material both quantitatively and qualitatively to SCJ's valuation of the business. For example, the Regional Financial Statements which DowBrands prepared specifically for potential purchasers in connection with the sale, demonstrate that in 1993, 1994 and 1995, years in which the U.S. business suffered operating losses, Latin America was the most profitable geographical segment of the Business. (PX 62; Tr. at 104:20–107:13; 1459:3–1461:20). Additionally, in 1996 Latin America accounted for over 10% of DowBrands' global operating income. (Tr. at 1328:9–1329:12). Further, Latin America had the highest operating profit percentage of all of DowBrands' geographical regions and, as a result, was more profitable than the entire Canadian business, even though the Canadian business had far greater sales. (PX 62; PX 318; PX 73; Tr. at 118:21–123:7; 1328:9–16). Although DowBrands contends that Latin American profits were artificially inflated because DowBrands' financial statements, which it had prepared for potential purchasers, did not fairly allocate certain corporate expenses, the Court finds this argument unpersuasive due to the fact that DowBrands prepared these financial statements. Therefore, given Latin America's profitability, SCJ's global presence in 55 countries, its strategy of global expansion and the fact that the European and Japanese markets were unavailable, the Court concludes that Latin America's business assumed an added importance in the consideration of SCJ's acquisition of DowBrands. (Tr. at 79:20–80:6; 81:2–3; 123:16–124:2; 124:24–125:17; 80:7–81:14; 123:16–124:2; 126:8–13; 649:17–652:11; PX 180; PX 150 at SC12269; PX 23 at 24–25; Tr. at 87:16–88:16; 88:24–90:3;

125:18–127:8). Based on these quantitative and qualitative factors, the Court concludes that Latin American sales and profits were material in SCJ's valuation of the business.

Additionally, DowBrands contends that certain disclosures indicated that there was diversion in Latin America, and as a result, SCJ had a duty to investigate if there was diversion, and since they did not, this precludes a finding of fraudulent misrepresentation. For example, DowBrands contends that the following information raised a "red flag" which required an investigation: (1) DowBrands informed SCJ that it terminated Quality Lines for diversion; (2) the Euromonitor report placed in the second data room indicated that there were no products found in Latin America; and (3) SCJ conducted its own pre-sale survey which found no products on the shelves in Latin America.

First, the Court notes that under Delaware law "the purchaser of a business is under no duty to investigate the accuracy of representations made by the seller concerning its profitability and operational affairs, even when there is an opportunity to do so." *Craft v. Bargilio,* 1984 WL 8207 at *10 (Del.Ch. March 1, 1984). Additionally, under Delaware law, a buyer's independent review or investigation will not preclude reliance on the seller's representations unless the investigation was so thorough and complete as to be "of such a character as to fully acquaint him with the essential facts." *Omar Oil & Gas v. Mac-Kenzie Oil Co.,* 138 A. 392, 397 (Del.1926). Also, "if only a partial investigation is made, under proper circumstances, a party may rely on another's representation to his detriment particularly where the other person has superior knowledge." *Lock v. Schreppler,* 426 A.2d 856, 861–62 (Del.Super.Ct.1981), *superceded by statute in part on other grounds as stated in, Amato & Stella Assoc. v. Florida North Invest-*

*ments, Ltd.,* 678 F.Supp. 445, 448 (D.Del. 1988).

Applying the applicable law, the Court concludes that SCJ had no affirmative duty to investigate diversion in Latin America. Also, the Court concludes that SCJ's pre-sale survey based on public information did not amount to a full investigation, and therefore, SCJ was entitled to rely on DowBrands' later representations regarding the Latin American business, which were based on superior knowledge. Accordingly, the Court concludes that a finding of fraudulent misrepresentation is not precluded.

Second, despite the fact that DowBrands terminated Quality Lines in July of 1997, it did not disclose this fact in the Offering Memorandum, the Management Presentation, or either data room. Nor did DowBrands indicate that the accuracy of the Regional Financial Statements had been or would be affected by the termination, even though the updated Regional Financial Statements that were provided by DowBrands were dated September 16, 1997– over three months after the termination. Also, although the Euromonitor Report placed in the second data room indicated that no DowBrands products were found on the shelves in Latin America, this document was non-copyable and was part of a document that was more than one hundred pages. Based on these facts and the relevant law, the Court concludes that SCJ reasonably and justifiably relied on DowBrands' material representations about the existing profitable Latin American business in determining its valuation of Dow-Brands' business.

### E. SCJ Was Damaged as A Result of DowBrands' Material Representations Regarding the Profitability of Latin America

The Court concludes that SCJ was harmed as a result of DowBrands' misrep-

resentations regarding the profitability of the Latin American business, and therefore, is entitled to the benefit of its bargain. Delaware law recognizes two measures of damages in cases of fraud or deceit. *Stephenson v. Capano Development, Inc.*, 462 A.2d 1069, 1076 (Del.1983) (citations omitted). The first, and most commonly accepted measure is the benefit of the bargain rule. *Id.* Under the benefit of the bargain rule, the plaintiff recovers the difference between the actual and represented values of the object of the transaction. *Id.* The other rule, which is applied less frequently, is one that gives the plaintiff the difference between what he paid and the actual value of the item. *Id.*

■ In this case, the Court concludes that the benefit of the bargain rule is the most appropriate measure of damages. The benefit of the bargain rule puts "the plaintiff in the same financial position that he would have been in if the Defendant's representations had been true." *Id.* The Court finds that the Delaware Chancery Court decision, *Tam v. Spitzer*, 1995 WL 510043 (Del.Ch. August 17, 1995), has similar factual circumstances and is instructive in applying the benefit of the bargain rule. In *Tam*, plaintiff purchased a data processing business from the defendant, and calculated the value of the entire business, using a discounted cash flow analysis. *Id.* at *12. After the transaction closed, plaintiff discovered that the defendant had misrepresented the future revenues that could be expected from St. Francis Hospital, the business' key customer. *Id.* at *5–6. In fact, St. Francis had informed the defendant before the sale that it intended to terminate its relationship. *Id.* at *7–8. Applying the benefit of the bargain rule, the Chancery Court accepted the plaintiff's discounted cash flow methodology and valuation data that plaintiff used to arrive at the purchase price, but then deducted the revenue and expenses attributable to St. Francis. *Id.* at *32–33. The court found

that "backing out" the value attributable to St. Francis from the purchase price properly measured the difference between the actual and represented value of the business. *Id.* at *12.

Similarly, in the case at bar, DowBrands falsely misrepresented the profitability of the Latin American business as is evidenced by the lack of sales after closing. Additionally, SCJ, utilizing a discounted cash flow analysis, valued the entire business at $1.212 billion. Of the total valuation, approximately $23.6 million was based directly on the existing Latin American business (excluding Puerto Rico) as represented by DowBrands. (PX 150; PX 323; Tr. at 148:23–150:8; 714:19–715:2). SCJ calculated the $23.6 million value of the Latin American business by using the 1996 and 1997 financial data from the updated Regional Financial Statements in its discounted cash flow analysis. When SCJ prepared its final bid, SCJ employed the discounted cash flow analysis on an aggregate basis for all existing international sales and profits; however, it did not prepare a separate discounted cash flow analysis at the time for the existing Latin America business (or any other region) alone. To calculate its damages, SCJ extracted (or "backed out") the portion of the valuation of the entire existing international business that was specifically attributable to existing profits in Latin America, which SCJ contends equals $23.6 million. (PX 181; PX 323; PX 324; Tr. at 704:12–714:18; 743:24–744:2: Anderson Dep. 41:14–42:20).

DowBrands challenges SCJ's calculation of damages in several respects. First, DowBrands contends that SCJ incorrectly assumed that the diverted Latin American sales had no value. The record indicates that there were no Latin American sales until five months after closing, which was the end of SCJ's fiscal year. Additionally,

the very definition of diversion implies that there is no actual business in the market from which the product is diverted. Therefore, the Court finds that SCJ's zero value was correct because the actual value of the Latin American business sold to SCJ was zero. Second, DowBrands contends that SCJ would not have changed its bid had it known that there was diversion. However, both Mr. McCollum and Mr. English, whom the court finds credible, testified that SCJ would have changed its bid by at least $23.6 million, if SCJ had known about the diversion. (Tr. at 154:9–155:22; 715;13–716:1).

Third, DowBrands argues that despite the claimed diversion, the overall business exceeded SCJ's expectations after closing. The Court finds this argument unpersuasive because based on DowBrands' representations, SCJ reasonably believed that it was purchasing a business with a profitable level of sales in the United States as well as Latin America, and therefore, the Court concludes that SCJ is entitled to recover the difference between the actual and represented value of the Latin American business. Fourth, DowBrands contends that SCJ's damage calculation contains numerous computational errors including incorrectly assuming a functional expenses adjustment of 2% and an adjustment for depreciation. In regard to functional expense, Mr. English, whom the court finds credible, testified that he calculated this number in the same manner as SCJ's original valuation and even increased it in order to be conservative. (Tr. at 711:14–712;22). Additionally, Mr. English testified that the percentage differed from the business as a whole because DowBrands operated Latin America as an incremental business. *Id.* In regard to depreciation, Mr. Dunbar, DowBrands' expert agreed that SCJ would have appropriately subtracted that number if depreciation was included in the cost of goods sold. Also, both Mr. En-

glish and Mr. Anderson testified that depreciation was included in the cost of goods sold, a fact that no DowBrands' employee contradicted at trial. (Tr. at 1395:19–1396:4; 713:13–21; Anderson Dep. 122:4–17). Based on this, the Court finds that SCJ properly assumed the functional expense adjustment of 2% and adjusted for depreciation in its damages calculation.

Fifth, DowBrands contends that SCJ calculated damages for all Latin American sales, excluding Puerto Rico, but contends that SCJ conceded in interrogatory answers that DowBrands had a real business in the Caribbean and that some products were found in Venezuela. As a result, DowBrands contends that the damages calculation should reflect this adjustment. The Court finds this argument unpersuasive due to the finding that the value of the bargained for Latin American business sold to SCJ was zero.

Lastly, DowBrands contends that SCJ's claimed damages of $23.6 million represents the portion of SCJ's total valuation of $1.212 billion attributable to Latin America. However, DowBrands argues that SCJ only paid $1.125 billion for DowBrands, which was 93% of the $1.212 billion valuation. As a result, DowBrands contends that SCJ's damages calculation must be reduced to reflect the ratio of the purchase price to the valuation. SCJ has no real response to this argument. In a footnote SCJ states that "[j]ust like the *Tam* defendant, DowBrands is responsible to reimburse SCJ for the amount of the purchase price that represented the value of the non-existent business." (D.I. 167 at 24 n. 9).

The Court concludes that SCJ's damages calculation must be reduced to reflect the ratio of the purchase price to the valuation. Given that SCJ paid $1.125 billion for DowBrands, which was 93% of the

596

valuation, SCJ's agreement that Dow-Brands is responsible to reimburse them for the "amount of the purchase price" attributable to Latin America and the instructive case law on the benefit of the bargain rule, the Court concludes that SCJ is entitled to damages in the amount of $21,948,000.00, which is 93% of its valuation of the Latin American business as derived from the valuation of the business as a whole.

## CONCLUSION

In sum, the Court concludes that SCJ has proven by a preponderance of the evidence that: (1) DowBrands made false representations concerning the profitability of the Latin American business; (2) DowBrands knew that their representations were false or at the very least made them with reckless indifference as to their truth or falsity; (3) DowBrands intended to induce SCJ to act in reliance on their representations; (4) SCJ reasonably and justifiably relied on DowBrands' representations concerning the Latin American Business in formulating its bid for the acquisition of the business; and (5) Plaintiff was damaged as a result of these misrepresentations and is entitled to damages in the amount of $21,948,000.00.

Plaintiff shall submit a Proposed Order within ten (10) days of its receipt of this Memorandum Opinion. Defendants may stipulate to Plaintiff's Proposed Order, or file any objections within five (5) days of their receipt of the Proposed Order.